**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**

**CASE NO:**

ZAKARIYAH ARRAZOLA and
TYRAANN PARKER, individually and
on behalf of all others similarly situated

Plaintiffs,

**CLASS REPRESENTATION**
**JURY TRIAL DEMANDED**

vs.

HATCHITT TAX CLUB, INC. and
JOSEPH DELFGAUW.

Defendant.
__________________________________/

**CLASS ACTION COMPLAINT**

Plaintiffs, ZAKARIYAH ARRAZOLA ("Arrazola") and TYRAANN PARKER ("Parker") (collectively "Plaintiffs"), bring this class action against HATCHITT TAX CLUB, INC. ("Hatchitt") and JOSEPH DELFGAUW ("Delfgauw") (collectively referred to as "Defendants") for their violations of the Telephone Consumer Protection Act, 47 U.S.C. § 227, *et seq.*, (hereinafter the "TCPA"), the Florida Telephone Solicitation Act, § 501.059 (hereinafter

"the FTSA"), and the regulations promulgated thereunder. In support, Plaintiffs allege as follows:

## INTRODUCTION

1. Plaintiffs bring this Class Action Complaint for damages, injunctive relief, and all other available legal or equitable remedies, resulting from Defendants' unlawful actions in negligently and/or willfully contacting Plaintiffs on their personal cellular telephones, thereby invading Plaintiffs' privacy.

2. To promote and market their services, Defendants, directly or through persons on their behalf, violate Fla. Stat. § 501.059 and 47 C.F.R. 64.1200(c) and (d) by failing to honor opt-out instructions and Florida's Caller Identification ("Caller ID") Rules.

3. Plaintiffs and Class Members received unwanted spam telemarketing text messages from Defendants without regard to the FTSA, the TCPA, and for individual privacy. This lawsuit challenges all telemarketing text messages that were sent by Defendants, or on Defendants' behalf, to Plaintiffs and Class Members from approximately January 2022, through the date of preliminary approval of class certification.

4. The FTSA and TCPA were designed to prevent telemarketing text messages like the ones described within this Complaint, and to protect the privacy of citizens like Plaintiffs and the Classes. The Federal Communications Commission (FCC) reports that unwanted calls and texts constitute its top consumer complaint. *See* Federal Communications Commission, *Stop Unwanted Calls and Texts* (Mar. 2, 2021), https://www.fcc.gov/consumers/guides/stop-unwanted-calls-and-texts (last visited Apr. 16, 2021).

## JURISDICTION AND VENUE

5. This Court has federal question subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 47 U.S.C. § 227, and supplemental jurisdiction over Plaintiffs' state law claims.

6. Venue in this judicial district is proper under 28 U.S.C. § 1391(b)(2), because a substantial part of the events or omissions giving rise to the claims in this case occurred in this District, including Defendants' transmission of the unlawful and unwanted texts to Plaintiffs which emanated from this District and/or were transmitted to Plaintiff Arrazola and Class Members in this District.

7. Plaintiff Arrazola resides in Orange County, Florida, where the subject text messages were received by him, within the jurisdiction of this Honorable Court.

8. Defendant Delfgauw resides in Lee County, Florida, where the subject text messages to Plaintiffs were transmitted and/or authorized to be transmitted by him, within the jurisdiction of this Honorable Cour

9. The Court has personal jurisdiction over Defendants because they conduct business in this state, market their services within this state, and have availed themselves to the jurisdiction of this state by placing texts messages to Plaintiffs and Class Members from and/or in this state.

**PARTIES**

10. Plaintiff Arrzola's domicile is in Orange County, Florida. Plaintiff is a citizen of the State of Florida.

11. Plaintiff Parker's domicile is in Washington County, Wisconsin. Plaintiff is a citizen of the State of Wisconsin.

12. Defendant Hatchitt is a limited liability company with its principal address located at 4370 Chicago Drive SW, Suite 118, Grandville, Michigan 48418.

13. Defendant Delfgauw is an individual natural person who resides at 3405 SW 8th Street, Cape Coral Florida, 33991.

14. Delfgauw is the President of Hatchitt.

15. Delfgauw owned, operated, controlled, and/or was an officer, employee, and agent of Hatchitt.

16. Hatchitt is a company engaged in tax planning and consultation services.

17. Delfgauw is Hatchitt's President and is its telemarketing expert.

18. Defendants at all times relevant hereto were "telephone solicitors" as defined by Fla. Stat. § 501.059(f).

19. Defendants directly, individually, jointly, and/or in concert with another, or through other persons, entities or agents acting on their behalf, conspired to, agreed to, contributed to, authorized, assisted with, ratified, and/or otherwise caused all of the wrongful acts and omissions, including the dissemination of the unsolicited text messages that are the subject matter of this Complaint.

# FACTUAL ALLEGATIONS

## TCPA and FTSA BACKGROUND

20. In 1991, Congress enacted the TCPA to regulate the explosive growth of the telemarketing industry. In so doing, Congress recognized that "[u]nrestricted telemarketing . . . can be an intrusive invasion of privacy[,]" and found that federal legislation was needed because "telemarketers [could] evade [state-law] prohibitions through interstate operations.'" *Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368, 372 (2012) (citations omitted).

21. The TCPA specifically required the FCC to "initiate a rulemaking proceeding concerning the need to protect residential telephone subscribers' privacy rights to avoid receiving telephone solicitations to which they object." 47 U.S.C. § 227(c)(1).

22. The FCC was instructed to "compare and evaluate alternative methods and procedures (including the use of … company-specific do not call systems …)" and "develop proposed regulations to implement the methods and procedures that the Commission determines are most effective and efficient to accomplish purposes of this section." Id. at (c)(1)(A), (E).

23. Pursuant to this statutory mandate, the FCC established company-specific "do not call" rules. In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, 7 FCC Rcd. 8752 (Oct. 16, 1992) ("TCPA Implementation Order").

24. The FCC found that "the company-specific do-not-call list alternative is the most effective and efficient means to permit telephone subscribers to avoid unwanted telephone solicitations." *Id.* at 8765, ¶ 23.

25. However, recognizing that an honor system would probably be insufficient, the FCC found that it "must mandate procedures for establishing company-specific do-not-call lists to ensure effective compliance with and enforcement of the requirements for protecting consumer privacy." *Id.* at ¶ 24.

26. These regulations are codified at 47 C.F.R. § 64.1200(d)(1)-(7).

27. Specifically, these regulations require a company to keep a written policy, available upon demand, for maintaining a do-not-call list, training personnel engaged in telemarketing on the existence and use of its internal do-not-call list, and recording and honoring "do not call" requests for no less than five years from the time the request is made. 47 C.F.R. § 64.1200(d) (1, 2, 3, 6).

28. These policies and procedures prohibit a company from making calls for telemarketing purposes unless they have implemented these policies and procedures. 47 C.F.R. § 64.1200(d).

29. Accordingly, all telemarketing calls placed by or on behalf of Defendant violate the TCPA, unless Defendant can demonstrate that it has implemented the required policies and procedures.

30. There is a private right of action to enforce 47 C.F.R. § 64.1200(d) through § 227(c):

> [S]ection 227(c)(5)… empowers 'any person' to sue for damages and injunctive relief for do-not-call violations 'by or on behalf of' a company. In accordance with this statutory provision, the Commission's company-specific do-not-call rules provide that '[n]o person or entity shall initiate any call for telemarketing purposes to a residential telephone subscriber unless such person or entity has instituted procedures for maintaining a list of persons who request not to receive telemarketing calls made by or on behalf of that person or entity[.]' 47 C.F.R. § 64.1200(d).

*In re Dish Network*, 28 FCC. Rcd. 6574, ¶ 29 (2013)

31. The FTSA's Caller ID Rules require that persons making Telephonic Sales Calls[1] transmit – to the consumer's caller identification service

---

[1]. "Telephonic Sales Call" is defined as "a telephone call, text message, or voicemail transmission to a consumer for the purpose of soliciting a sale of any

– a telephone number that is capable of receiving telephone calls. And, unlike claims for damages for text message solicitations the called party does not consent to receive, claims for violations of the Caller ID Rules are equally applicable to all Telephonic Sales Calls (phone calls, text messages, or voicemails), regardless of whether they are solicited or consented to, and irrespective of whether the offending phone call, text message or voicemail is traditional, automated, or recorded.

32. In short, whenever a person either makes any type of Telephonic Sales Call or causes one to be made, that person must ensure that a telephone number is transmitted with that Telephonic Sales Call to the consumer's Caller ID service that is capable of receiving telephone calls and connects to either the telephone solicitor or the Defendant. Whenever Telephonic Sales Call are made and the phone number that is transmitted to the caller identification service is not capable of receiving phone calls and/or does not connect to the caller or seller because it is not configured for two-way communication, the Caller ID

---

consumer goods or services, soliciting an extension of credit for consumer goods or services, or obtaining information that will or may be used for the direct solicitation of a sale of consumer goods or services or an extension of credit for such purposes." Fla. Stat. § 501.059(1)(j).

Rules have been violated and the aggrieved party may bring an action for liquidated damages, and injunctive and declaratory relief.

***Defendants' Unlawful Calling Campaign***

33. Hatchitt, by and through its officers, employees, and agents — including Delfgauw — placed, or had placed on its behalf, unsolicited telemarketing text messages to solicit individuals to purchase or use its tax planning services.

34. Hatchitt, by and through its officers, employees, and agents — including Delfgauw — purchased lists of individuals that were believed to be in need of tax planning services and/or tax advance loans and uploaded their information into Defendants' or their agents' CRM and dialing systems so that these individuals or "prospects" could be "cold called/texted" and solicited to purchase Defendants' services.

35. Defendants placed these telemarketing messages to individuals that did not sign up for Defendants services or otherwise provide consent to be contacted by Defendants, and to individuals who expressly requested to no longer be contacted by Defendants. Defendants did not scrub their lead lists to remove individuals, like Plaintiff, who requested not to be contacted.

36. Under the TCPA, Delfgauw is personally liable for the acts and omissions alleged in this Complaint. *See Texas v. American Blastfax, Inc.,* 164 F.Supp.2d 892 (W.D.Tex. 2001); *Physicians Healthsource, Inc. v. A-S Medication Sols. LLC,* 324 F. Supp. 3d 973, 983 (N.D. Ill. 2018), aff'd 950 F.3d 959 (7th Cir. 2020); *Fischer v. Trivita, Inc.*, No. 6:19-cv-2333-Orl-41EJK, 2020 U.S. Dist. LEXIS 263824, 2020 WL 13349091, at *5 (M.D. Fla. July 30, 2020).

37. Further, a person or entity is liable for calls made on its behalf in violation of the TCPA, even if that person or entity did not directly dial such calls. *See, e.g., In re Rules & Regs. Implementing the TCPA*, 10 FCC Rcd. 12391, 12397 ¶ 13 (1995) (explaining that the FCC's "rules generally establish that the party on whose behalf a solicitation is made bears ultimate responsibility for any [TCPA] violations"). In fact, in May 2013, the FCC issued a binding declaratory ruling clarifying that sellers "may be held vicariously liable under federal common law principles of agency for TCPA violations committed by third-party telemarketers . . . under a broad range of agency principles, including not only formal agency, but also principles of apparent authority and ratification." *In re Joint Petition Filed by DISH Netowrk, LLC et al. for Declarator Ruling Concerning the TCPA Rules*, 28 FCC Rcd. 6574, 6584 ¶28 (2013).

38. Accordingly, an entity or person is liable under the TCPA for a prohibited call made on its behalf under a number of theories including vicarious liability. Under those circumstances, the seller is properly deemed to have initiated the call through the person or entity that actually placed the call

39. When considering individual officer liability under the TCPA, a corporate officer involved in the telemarketing at issue may be personally liable under the TCPA. *See, e.g., Jackson Five Star Catering, Inc. v. Beason*, 2013 U.S. Dist. LEXIS 159985, *10 (E.D. Mich. Nov. 8, 2013) ("[M]any courts have held that corporate actors can be individually liable for violating the TCPA "where they 'had direct, personal participation in or personally authorized the conduct found to have violated the statute.'"); *Maryland v. Universal Elections*, 787 F. Supp. 2d 408, 415-16 (D. Md. 2011) ("If an individual acting on behalf of a corporation could avoid individual liability, the TCPA would lose much of its force.").

40. Delfgauw had direct, personal participation in, and personally authorized, approved, and/or ratified the acts or omissions complained of herein.

41. Specifically, Delfgauw: (a) participated in the selection and approval of the agents, employees, marketers, and vendor(s) used to place texts; (b) the methods and means by which the lists of phone numbers that would be acquired and be texted; (c) designed and approved the telemarketing campaigns; (d) drafted, worked on, and approved the scripting that would be used on the texts; and (e) selected, contracted for, and approved the CRM and dialing systems and equipment used to make the texts.

42. Indeed, Delfgauw was not merely tangentially involved in Hatchitt's operations. He had direct, personal participation in, or personally authorized, approved, or ratified the unlawful telemarketing, and was otherwise personally aware of Hatchitt's telemarketing practices, yet he continued to engage in and otherwise ratified the violative practices.

43. Delfgauw had actual knowledge of the violative practices but continued to participate in them and failed to stop them.

44. Despite knowing the conduct was illegal, Delfgauw continued with Hatchitt's illegal campaign because it was profitable.

45. Accordingly, Delfgauw is individually and directly liable for the violations of the TCPA and the damages alleged in this Complaint.

**The Illegal Telemarketing to Arrazola.**

46. Arrazola's telephone number ending in 1258 has received Defendants' Telephonic Sales Calls since at least August 2025. This number is used by Arrazola for residential purposes and is considered by him to be a residential number.

47. Screen shots of the telemarketing to Arrazola, including Arrazola's "STOP" request, are depicted below for demonstrative purposes:







48. Defendant transmitted the telemarketing using a short code, 71988, to Arrazola's cellular number caller identification service. Through the investigation of counsel calls to 71988 could not be completed as dialed.

49. Moreover, because Defendant continued to solicit Arrazola despite Arrazola's "STOP" request, it demonstrates both that an automated system was used to transmit the messages, and that short code 71988 was not capable of receiving Plaintiffs' incoming messages and removing Plaintiffs from Defendants' telemarking list.

50. To opt-out of any further telemarketing text communications with Defendants, Arrazola texted the word "stop" on August 25, 2025. Defendants ignored Arrazola's request and continued to text promotional telemarketing messages despite Arrazola's clear revocation of any alleged prior consent, including *at least* six (6) post-revocation text messages.

**The Illegal Telemarketing to Parker.**

51. Beginning at least in September 2024, Defendants began bombarding Parker with telemarketing text messages to Plaintiff's 7971 Number, from Defendants' 71988 number. This number is used by Parker for residential purposes and is considered by her to be a residential number.

52. On or about September 18, 2024, Parker texted STOP, in an attempt to opt-out of any further text message communications with Defendants.

53. Screen shots of *some* of the telemarketing to Parker, including Parker's "STOP" requests, are depicted below for demonstrative purposes:


11:50
hatchitt
62/62 results found
from our tax refund alternative program, you're already approved. To get the money, reply with your invite code 24694
Tuesday, Sep 17, 2024 • 6:02 PM
Tyraann, I still have your cash from our tax refund alternative program, you're already approved. To get the money, reply with your invite code 24692
Wednesday, Sep 18, 2024 • 1:06 PM
Stop
Text message
hatchitt
62/62 results found
before 6pm Monday. More available:
https://ol.hatchitt.com/?pc=4145397971
Reply Stop to OPTOUT
Wednesday, Mar 12 • 8:04 AM
Tyraann, your application process takes less than a minute. Resubmit:
https://ol.hatchitt.com/?pc=4145397971
Reply Stop to OPTOUT
Wednesday, Mar 12 • 1:25 PM
Stop
Text message




54. Defendants transmitted the telemarketing using a short code, 71988, to Parker's cellular number caller identification service. Through the investigation of counsel calls to 71988 could not be completed as dialed.

55. Moreover, because Defendants continued to solicit Parker despite Parker's numerous "STOP" requests, it demonstrates both that an automated

system was used to transmit the messages, and that short code 71988 was not capable of receiving Plaintiffs' incoming messages and removing Plaintiffs from Defendants' telemarking list.

56. To opt-out of any further telemarketing text communications with Defendants, Parker texted the word "stop" at least seven times. Defendants ignored Parker's request and continued to text promotional telemarketing messages despite Parker's clear revocation of any alleged prior consent, including *at least* sixty-three (63) post-revocation text messages, including as recently as January 6, 2026.

**Defendants' dialing system.**

57. Upon information and belief, the selection and dialing of numbers for the texts at issue are done using an automated system because the texts were sent from a short code used to message consumers en masse; because Defendants' dialing equipment includes features substantially similar to a predictive dialer, inasmuch as it is capable of making calls/texts without manually dialing the recipients numbers; and because the combination hardware and software system(s) used by Defendants to send such texts have the capacity to both select numbers to be dialed and to dial such numbers in an

automated fashion based on predetermined, programmed, or random criteria or settings.

58. Defendants' automated system selects and dials numbers from a lead list of numbers to be dialed without regard to whether those numbers have requested to no longer be contacted. If it was not automated, human intervention would have prevented the texts from being placed to a number that should have been "flagged" as do-not-call.

59. The FTSA's Caller ID Rules require any person "who makes a telephonic sales call or causes a telephonic sales call to be made to … transmit … the originating telephone number," or, as a substitution, "the name of the seller on behalf of which a telephonic sales call is placed and the seller's customer service telephone number, which is answered during regular business hours" ("Customer Service Number"), to the receipt's caller identification service.

60. Here, with each of Defendants' telemarketing text messages, Defendants transmitted a telephone number to the Caller ID Service of Plaintiffs and the Plaintiff Class that was not capable of receiving telephone calls and failed to connect the recipients, including Plaintiffs, to the Defendants, as explicitly required by the FTSA's Caller ID Rules.

61. Further, Plaintiffs never provided Defendants with their prior express written consent or any other party acting on Defendants' behalf to authorize the subject telemarketing text messages. Indeed, prior to making (or knowingly allowing a third party to make on its behalf) the subject telemarketing text messages Defendants lacked a signed written agreement with Plaintiffs that complies with the requirements of the TCPA and Fla. Stat. § 501.059(1)(g).

62. Defendants' failure to honor opt-out instructions by Plaintiffs and the Class members is indicative of Defendants' failure to 1) maintain adequate written policies and procedures regarding its text messaging marketing; (2) provide training to its personnel engaged in telemarketing; and (3) maintain a standalone do-not-call list.

63. To the extent Defendants outsourced the telemarketing campaign, it is nonetheless liable for texts that violate the TCPA and/or FTSA.

64. Defendants are liable for third-party actions if they took steps to cause the telemarketing texts to be made, or if the telemarketing texts were made pursuant to Defendants' actual authority, apparent authority and/or ratification, or pursuant to joint enterprise or acting in concert liability.

65. Defendants had the ability and/or right to control the method and scope of the telemarketing text message campaigns sent to Plaintiffs and the Class members.

66. Defendants had the ability and/or right to control the timing and approve, write, and review the content of the telemarketing text message campaigns sent to Plaintiffs and the Class members.

67. Defendants authorized the use of its trade name in the telemarketing text messages sent to Plaintiffs and the Class members.

68. Defendants knowingly accepted the marketing benefits of the telemarketing text messages sent to Plaintiffs and the Class members, including the consumer leads generated through transmissions of the messages.

69. Given Defendants' control over the telemarketing text messaging campaigns at issue and/or its ratification of the campaigns, Defendants are vicariously liable for the violations alleged herein.

70. Defendants failed to keep, maintain, implement, and/or enforce policies and procedures to ensure compliance with the FTSA and TCPA, and/or provide adequate oversight to ensure compliance with any policies it maintained.

71. Compliance with the FTSA will not result in Defendants having to cease its business operations.

72. Compliance with the FTSA will not result in Defendants having to alter the prices of goods or services it provides in the marketplace.

73. Compliance with the FTSA will not force Defendants to seek regulatory approval from the State of Florida before undertaking any type of commercial transaction.

74. Because Defendants' FTSA violations occurred in Florida, requiring Defendants' compliance with the FTSA will not have the practical effect of regulating commerce occurring wholly outside of Florida.

75. Plaintiffs were the subscribers or customary users of their respective cellular telephone numbers that Defendants texted and are financially responsible for their phone service, including the cellular costs and data usage incurred as a result of the calls made to Plaintiffs by Defendants.

76. The telemarketing text messages at issue caused Plaintiffs and putative Class Members harm. In addition to using their cellular data, storage, and battery life, they suffered invasion of privacy, aggravation, annoyance, frustration, distraction, and their seclusion was intruded upon, forcing them to

divert attention away from their work, home life and other activities, inconvenience, wasted time, risk of future harm, causing disruption to their work, sleep, and other activities, and violations of their substantive statutory rights under the TCPA and FTSA to remain free of unsolicited calls. The texts are a disruptive nuisance. Not only did the receipt of the text messages distract and take time away from Plaintiffs' personal and work activities. *See Drazen v. GoDaddy.com, LLC,* No. 21-10199 (11th Cir. July 24, 2023 (en banc) ("A plaintiff who receives an unwanted, illegal text message suffers a concrete injury"); *See Muransky v. Godiva Chocolatier, Inc.,* 905 F.3d 1200, 1211 (11th Cir. 2018). ("[T]ime wasting is an injury in fact"…. "[A] small injury… is enough for standing purposes");*See, e.g., Mims v. Arrow Fin. Servs., Inc.*, 132 S. Ct. 740 (Jan. 18, 2012) (discussing congressional findings of consumer "outrage" as to autodialed and prerecorded calls).

77. Plaintiffs and Class Members had to spend wasted time away from work, family, and personal activities, and suffered aggravation, because of Defendants' unsolicited telemarketing text messages.

78. For example, apart from forcing Plaintiffs to spend time investigating the source of the text messages and investing time researching and

hiring counsel, Plaintiffs received some of the unsolicited telemarketing text messages while they were sharing personal and intimate time with family. This caused Plaintiffs to stop to check their phones and waste time reviewing the messages to confirm they were not for an emergency purpose, causing specific injury, trespass, intrusion and disruption onto Plaintiffs' personal and daily life.

79. Because Plaintiffs and Class Members continued to received telemarketing texts from Defendants after they texted "stop" revoking any conceivable consent, demonstrates the need for judicial intervention and injunctive relief to enjoin any continued and future harm.

80. Furthermore, because Defendants have previously been the subject of litigation involving the identical claims and violations alleged here, including Defendants' use of the short code 71988 to send text message solicitations after receiving STOP requests, it demonstrates willfulness.

81. Moreover, undersigned counsel provided pre-suit notice to Defendants' counsel regarding the on-going violations to Arrazola. Despite this actual notice of the continued violations, Defendants continued with their telemarketing campaign, as evidenced at least by the January 6, 2026, text message to Parker.

82. Because Defendants continue to violate the law and have not reformed their telemarketing practices despite previously being sued for the same conduct, an enforceable injunctive order is necessary to stop Defendants' continued violations.

## CLASS ACTION ALLEGATIONS

83. Plaintiffs bring this class action under Rule 23(a),(b)(2), and(b)(3) of the Federal Rules of Civil Procedure, on behalf of herself and of a similarly situated "Class" or "Class Members" defined as:

> **Internal DNC Class: All persons within the United States who, within the four years prior to the filing of this Complaint, received any telemarketing text message from or on behalf of Defendant, to said person's cellular telephone number *after* making a request to Defendant to not receive future telemarketing text messages.**
>
> **FTSA ID Class: All persons and entities that reside in Florida whose caller identification service was transmitted a telephone number that was not capable of receiving telephone calls and/or failed to connect callers to the Defendant's when Defendants telemarketing calls were transmitted to them since July 1, 2021.**
>
> **FTSA Internal DNC Class: All persons within the State of Florida who received any text message from or on behalf of Defendant at least 15 days *after* communicating to Defendant that they did not wish to receive text messages by replying to the messages with "stop" or**

**similar opt-out instruction between July 1, 2021, to the date of Class Notice.**

84. Excluded from the Class are: any Defendant, and any subsidiary or affiliate of that Defendant, and the directors, officers and employees of that Defendant or its subsidiaries or affiliates, and members of the federal judiciary.

85. This action has been brought and may properly be maintained as a class action against Defendants because there is a well-defined community of interest in the litigation and the proposed Class is easily ascertainable. Plaintiffs reserve the right to amend, expand, or narrow the Class definition if discovery and further investigation reveal that any Class should be expanded or otherwise modified.

86. **Numerosity**: At this time, Plaintiffs do not know the exact number of Class Members, but among other things, given the nature of the claims and that Defendant's conduct consisted of a standardized spam text messaging campaign electronically sent to particular telephone numbers, Plaintiffs believe, at a minimum, there are greater than forty (40) Class Members. Plaintiffs believe that the Class is so numerous that joinder of all members of the Class is impracticable and the disposition of their claims in a class action rather than incremental individual actions will benefit the Parties and the Court by

eliminating the possibility of inconsistent or varying adjudications of individual actions.

87. Upon information and belief, a more precise Class size and the identities of the individual members thereof are ascertainable through Defendants' records, including, but not limited to Defendant's texting logs and marketing records.

88. Members of the Class may additionally or alternatively be notified of the pendency of this action by techniques and forms commonly used in class actions, such as by published notice, e-mail notice, website notice, fax notice, first class mail, or combinations thereof, or by other methods suitable to this class and deemed necessary and/or appropriate by the Court.

89. **Existence and Predominance of Common Questions of Fact and Law**: There is a well-defined community of common questions of fact and law affecting the Plaintiffs and members of the Class. Common questions of law and/or fact exist as to all members of the Class and predominate over the questions affecting individual Class members. These common legal and/or factual questions include, but are not limited to, the following:

a. Whether Defendants initiated telemarketing text messages sent to Plaintiffs and Class members;

b. Whether, within the four years prior to the filing of this Complaint, Defendants or its agents sent any unsolicited text message(s) (other than a message made for emergency purposes or made with the prior express consent of the called party) to a Class member's telephone number assigned to a cellular phone service;

c. How Defendants obtained the numbers of Plaintiffs and Class members;

d. Whether Defendants can meet its burden of showing that it had and maintained prior express written consent to send such texts;

e. Whether Defendants continued send text after receiving STOP requests;

f. Whether Defendants willfully or knowingly violated Fla. Stat. § 501.059 and its regulations;

g. Whether Defendants willfully or knowingly violated 47 C.F.R § 64.1200(d);

h. Whether Plaintiffs and the members of the Class are entitled to statutory damages, treble damages, and attorney fees and costs for Defendant's acts and conduct;

i. Whether Plaintiffs and members of the Class are entitled to a permanent injunction enjoining Defendants from continuing to engage in its unlawful conduct; and

j. Whether Plaintiffs and the Class are entitled to any other relief.

90. One or more questions or issues of law and/or fact regarding Defendants' liability are common to all Class Members and predominate over any individual issues that may exist and may serve as a basis for class certification under Rule 23(c)(4).

91. **Typicality**: Plaintiffs' claims are typical of the claims of the members of the Class. The claims of the Plaintiffs and members of the Class are based on the same legal theories and arise from the same course of conduct that violates the FTSA and TCPA.

92. Plaintiffs and members of the Class each received at least one telephonic sales call, advertising Defendants' services without prior express

written consent, which Defendants sent or caused to be sent to Plaintiff and the members of the Class.

93. **Adequacy of Representation:** Plaintiffs are adequate representatives of the Class because Plaintiffs' interests do not conflict with the interests of the members of the Class. Plaintiffs will fairly, adequately and vigorously represent and protect the interests of the members of the Class and has no interests antagonistic to the members of the Class. Plaintiffs have retained counsel, who are competent and experienced in TCPA litigation and class action litigation.

94. **Superiority**: A class action is superior to other available means for the fair and efficient adjudication of the claims of the Class. While the aggregate damages which may be awarded to the members of the Class are likely to be substantial, the damages suffered by individual members of the Class are relatively small. As a result, the expense and burden of individual litigation makes it economically infeasible and procedurally impracticable for each member of the Class to individually seek redress for the wrongs done to them. Plaintiff does not know of any other litigation concerning this controversy already commenced against Defendants by any member of the Class. The

likelihood of the individual members of the Class prosecuting separate claims is remote. Individualized litigation would also present the potential for varying, inconsistent or contradictory judgments, and would increase the delay and expense to all parties and the court system resulting from multiple trials of the same factual issues. In contrast, the conduct of this matter as a class action presents fewer management difficulties, conserves the resources of the parties and the court system, and would protect the rights of each member of the Class. Plaintiff knows of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action.

95. **Class-Wide Injunctive Relief:** Moreover, as an alternative to or in addition to certification of the Class under Rule 23(b)(3), class certification is warranted under Rule 23(b)(2) because Defendants has acted on grounds generally applicable to Plaintiffs and members of Class, thereby making appropriate final injunctive relief with respect to Plaintiff and Class Members as a whole. Plaintiffs seek injunctive relief on behalf of Class Members on grounds generally applicable to the entire Class in order to enjoin and prevent Defendants' ongoing violations, and to order Defendants to provide notice to

them of their rights to statutory damages and to be free from unwanted text messages.

**CAUSES OF ACTION**

**COUNT I**

**VIOLATIONS OF 47 U.S.C. § 227(c) AND C.F.R. § 64.1200(c)**

**(On behalf of Plaintiffs and the Internal DNC Class)**

96. Plaintiffs incorporate by reference all of the allegations contained in Paragraphs 1 through 95 of this Complaint that pertain to the Defendants, respectively, as if set forth verbatim herein.

97. 47 C.F.R. § 64.1200(d), in relevant part, provides: "No person or entity shall initiate any call for telemarketing purposes to a residential telephone subscriber unless such person or entity has instituted procedures for maintaining a list of persons who request not to receive telemarketing calls made by or on behalf of that person or entity. The procedures instituted must meet the following minimum standards including:

> *(1) Written policy*. Persons or entities making calls for telemarketing purposes must have a written policy, available upon demand, for maintaining a do-not-call list.
>
> (2) *Training of personnel engaged in telemarketing*. Personnel engaged in any aspect of telemarketing must be informed and trained in the existence and use of the do-not-call list.

(3) *Recording, disclosure of do-not-call requests.* If a person or entity making a call for telemarketing purposes (or on whose behalf such a call is made) receives a request from a residential telephone subscriber not to receive calls from that person or entity, the person or entity must record the request and place the subscriber's name, if provided, and telephone number on the do-not-call list at the time the request is made. Persons or entities making calls for telemarketing purposes (or on whose behalf such calls are made) must honor a residential subscriber's do-not-call request within a reasonable time from the date such request is made. This period may not exceed thirty days from the date of such request. If such requests are recorded or maintained by a party other than the person or entity on whose behalf the telemarketing call is made, the person or entity on whose behalf the telemarketing call is made will be liable for any failures to honor the do-not-call request. A person or entity making a call for telemarketing purposes must obtain a consumer's prior express permission to share or forward the consumer's request not to be called to a party other than the person or entity on whose behalf a telemarketing call is made or an affiliated entity. . .

(6) *Maintenance of do-not-call lists*. A person or entity making calls for telemarketing purposes must maintain a record of a consumer's request not to receive further telemarketing calls. A do-not-call request must be honored for 5 years from the time the request is made.

98. Pursuant to 47 C.F.R § 64.1200, the rules set forth in 47 C.F.R. § 64.1200(d) are applicable to any person or entity making telephone solicitations or telemarketing calls to wireless telephone numbers.

99. Plaintiffs and others Internal DNC Class members made requests to Defendants not to receive telemarketing text messages from Defendants.

100. Defendants failed to honor Plaintiffs' and the Internal DNC Class members opt-out requests.

101. Defendants violated the requirements of section 64.1200(d) by failing to (1) maintain the required written policies; (2) provide training to its personnel engaged in telemarketing; and (3) maintain a standalone do-not-call list.

102. Pursuant to Section 227(c)(5) of the TCPA, Plaintiffs and the Internal DNC Class members are entitled to an award of $500.00 in statutory damages, for each telemarketing text message sent by Defendant. To the extent Defendants' misconduct is determined to be willful and knowing, the Court should, pursuant to 47 U.S.C. § 227(c)(5), treble the amount of statutory damages recoverable by the members of the Internal DNC Class.

WHEREFORE, Plaintiffs respectfully request the Court grant Plaintiff and the Class members relief against Defendants, individually, jointly, and collectively, as set forth in the Prayer for Relief below.

**COUNT II**
**VIOLATIONS OF FLORIDA STATUTE § 501.059(8)**
**(On behalf of Plaintiffs and the FTSA ID Class)**

103. Plaintiffs incorporate by reference all of the allegations contained in Paragraphs 1 through 95 of this Complaint that pertain to the Defendants, respectively, as if set forth verbatim herein.

104. Defendants violated the FTSA's Caller ID Rules (Fla. Stat. § 501.059(8)(b)) by placing telemarketing sales calls to Plaintiffs and the Class and, in doing so, transmitted to Plaintiffs and the Class's caller identification service a telephone number that was not capable of receiving telephone calls and that failed to connect to the Defendants' Callers.

105. Plaintiffs and the members of the Plaintiff Class are entitled to a declaration that Defendants' actions, as set out above, violate the FTSA's Caller ID Rules.

106. As a result of Defendants' conduct, and pursuant to Florida Statute § 501.059 (10)(a), Plaintiffs and the FTSA ID Class are entitled to an award of $500.00 in statutory damages, for each violation.

WHEREFORE, Plaintiff respectfully requests the Court grant Plaintiffs and the Class members relief against Defendants, individually, jointly, and collectively, as set forth in the Prayer for Relief below.

**COUNT III**
**VIOLATIONS OF FLORIDA STATUTE § 501.059(5)**
**(On behalf of Plaintiffs and the FTSA Internal DNC Class)**

107. Plaintiffs incorporate by reference all of the allegations contained in Paragraphs 1 through 95 of this Complaint that pertain to the Defendants, respectively, as if set forth verbatim herein.

108. It is a violation of the FTSA to initiate an outbound telephone call, text message, or voicemail transmission to a consumer, business, or donor or potential donor who has previously communicated to the person that he or she does not wish to receive an outbound call, text message, or voicemail transmission. Fla. Stat. § 501.059(5)(a), (b).

109. Plaintiffs and the FTSA Internal DNC Class Members made requests to Defendants not to receive spam telemarketing text messages from Defendant.

110. Defendants failed to honor Plaintiffs' and the FTSA Class Members opt-out requests.

111. In violation of the FTSA, Defendants made and/or knowingly allowed outbound telemarketing text messages to Plaintiffs and the FTSA Class members, at least 15 days after they had previously communicated to Defendant that they did not wish to receive any text messages from Defendant.

112. Here, Arrazola texted Defendants STOP on August 25, 2025. Plaintiff received at least four (4) text messages from Defendant 15 or more days after texting STOP.

113. Here, Parker texted Defendants STOP on September 18, 2024. Plaintiff received at least fifty (50) text messages from Defendants 15 or more days after texting STOP.

114. As a result of Defendants' conduct, and pursuant to Florida Statute § 501.059 (10)(a), Plaintiffs and the FTSA Internal DNC Class are entitled to an award of $500.00 in statutory damages, for each violation. To the extent

Defendants' misconduct is determined to be knowing and/or willful violations of the FTSA, the Court should, pursuant to Fla. Stat. § 501.059(10)(a)(b), treble the amount of statutory damages recoverable by the members of the FTSA Internal DNC Class.

WHEREFORE, Plaintiffs respectfully request the Court grant Plaintiffs and the Class members relief against Defendants, individually, jointly, and collectively, as set forth in the Prayer for Relief below.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs individually and on behalf of the Class(es), prays for the following relief:

a. An order certifying this case as a class action, certifying Plaintiffs as representatives of the Classes, and designating Plaintiffs' attorneys Class counsel;

b. An order declaring that Defendants' actions, as set out above, violate the FTSA, and TCPA and its implementing regulations;

c. Statutory damages of $500 per text message, for each FTSA and TCPA violation;

d. Willful damages at $1,500 per text message, for each FTSA and

TCPA violation;

e. An injunction prohibiting Defendants from texting numbers without the prior express written consent of the called party;

f. Reasonable attorney's fees and costs; and

g. Such further and other relief as this Court deems reasonable and just.

**DEMAND FOR JURY TRIAL**

Plaintiffs individually and on behalf of the Classes, hereby demand a trial by jury.

Dated: January 14, 2026

Respectfully submitted,

*/s/ Joshua Eggnatz*

Joshua H. Eggnatz, Esq.
Florida Bar No.: 0067926
**EGGNATZ | PASCUCCI**
7450 Griffin Road, Suite 230
Davie, Florida 33314
Tel: (954) 889-3359
jeggnatz@justiceearned.co
m

*/s/ Alexander Korolinsky*

Alexander J. Korolinsky, Esq.
Florida Bar No.: 119327

**AJK LEGAL**
1580 Sawgrass Corp Pkwy, Suite 130
Sunrise, Florida 33323
Tel: (888) 815-3350
korolinsky@ajklegal.com

*Counsel for Plaintiff and the Class*