**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**

**CASE NO:** 6:26-CV-85-JSS-RMN

ZAKARIYAH ARRAZOLA and
TYRAANN PARKER, individually and
on behalf of all others similarly situated

Plaintiffs,
vs.

**CLASS REPRESENTATION**
**JURY TRIAL DEMANDED**

HATCHITT TAX CLUB, INC. and
JOSEPH DELFGAUW, individually.

Defendants.
_________________________________/

## FIRST AMENDED CLASS ACTION COMPLAINT

Plaintiffs, ZAKARIYAH ARRAZOLA ("Arrazola") and TYRAANN PARKER ("Parker") (collectively "Plaintiffs"), bring this class action against HATCHITT TAX CLUB, INC. ("Hatchitt") and JOSEPH DELFGAUW ("Delfgauw") (collectively, "Defendants") for violations of the Telephone Consumer Protection Act, 47 U.S.C. § 227 et seq. ("TCPA"), the Florida Telephone Solicitation Act, Fla. Stat. § 501.059 ("FTSA"), the Florida Telemarketing Act, Fla. Stat. § 501.601 et seq. ("FTA"), and applicable regulations. Plaintiffs allege as follows:

## INTRODUCTION

1. Plaintiffs bring this First Amended Class Action Complaint for damages, injunctive relief, and other available remedies arising from Defendants' repeated transmission of telemarketing text messages to Plaintiffs' personal cellular telephone numbers through short code 71988, including messages sent after opt-out requests, during applicable quiet hours, and without statutorily compliant caller-identification information.

2. To promote and market their services, Defendants used short code 71988 to promote Hatchitt's tax-planning, tax-refund-advance, and related consumer products and services.

3. This action challenges standardized telemarketing practices employed by Defendants from approximately January 2022 through the date of class notice, including Defendants' failure to honor opt-out instructions and their use of a short code that could not receive voice calls or connect recipients to Defendants.

4. The FTSA, FTA, and TCPA protect consumers from the unwanted telemarketing communications and invasions of privacy alleged here.

## JURISDICTION AND VENUE

5. This Court has federal-question subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 and 47 U.S.C. § 227 over the TCPA claim asserted in this First Amended Complaint and supplemental jurisdiction over Plaintiffs' related state-law

claims. The Court also has jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d), because minimal diversity exists, the proposed Classes include at least 100 unique members, and Plaintiffs reasonably estimate that the aggregate amount in controversy exceeds $5 million, exclusive of interest and costs.

6. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred here. Arrazola and members of the proposed Classes received the challenged messages in Orange County, Florida, and Delfgauw initiated, personally participated in, directed, and/or authorized the challenged campaign from Cape Coral, Florida.

7. Plaintiff Arrazola resides in Orange County, Florida, where the subject text messages were received by him, within the jurisdiction of this Honorable Court.

8. Defendant Delfgauw resides in Lee County, Florida, where the subject text messages were transmitted or authorized to be transmitted by him, within the jurisdiction of this Court.

9. The Court has personal jurisdiction over Defendants because they conduct business in Florida, directed telemarketing activity to Florida consumers, and directed telemarketing activity from Florida, including initiating, transmitting, and/or conducting the 71988 campaign from Florida. Defendants also intended to target Florida consumers, including Parker, believing she was a Florida resident. Also, Hatchitt committed the acts alleged herein through its agent, Delfgauw, who lives in

and conducted the telemarketing activity from Florida. Hatchitt is liable for the acts committed by and through its agent, Delfgauw, and is subject to the jurisdiction of this Court by Florida's long-arm statute.

## PARTIES

10. Plaintiff Arrazola resides in Orange County, Florida.

11. Plaintiff Parker presently resides in Washington County, Wisconsin. However, Parker previously resided in Hillsborough County, Florida. She relocated to Wisconsin, but last filed a tax return while residing in, and as a resident of Florida. All her tax filings and associated public records are connected to Florida. As described below, Defendants sent the text-message solicitations to Parker believing that she was a Florida resident or based on information associated with her prior Florida residence and intending to solicit her as Florida resident.

12. Defendant Hatchitt Tax Club, Inc. is a Michigan corporation with a listed address at 4370 Chicago Drive SW, Suite 118, Grandville, Michigan 48418.

13. Hatchitt provides tax-planning and related products and services. The text-message solicitations sent to Plaintiffs promoted Hatchitt's products and services, including a tax-refund-alternative program involving a short-term loan or cash advance before a consumer's tax refund arrives.

14. Public corporate filings identify Delfgauw as Hatchitt's president and registered agent and lists his address at 4370 Chicago Drive SW, Suite 118, Grandville, Michigan 48418.

15. However, on Hatchitt's website it states its address is located at 30 N. Gould Street, Ste. R., Sheridan, WY, 82801.

16. Plaintiffs' investigation shows that the listed Michigan and Wyoming addresses are not actual operating locations for Hatchitt. No actual operations or business is located in either Michigan or Wyoming

17. A process server attested under penalty of perjury that Hatchitt did not operate from the listed Grandville address and that the location was a commercial mail-receiving facility. No suites are even located at the address location.

18. Before retaining undersigned counsel, Plaintiff Parker filed an action against Defendant Hatchitt in United States District Court for the Western District of Michigan. She voluntarily dismissed that action without prejudice after service could not be effectuated at Hatchitt's listed addresses.

19. The listed Wyoming address is a mail-receiving location used by numerous entities. It is not Hatchitt's operating place of business. The address has reportedly been used to perpetrate scams upon consumers.[1]

---

[1]. 30 N. Gould St. businesses blur lines of what it means to be a Sheridan business, Washington Tribune Eagle (Jan. 5, 2026), available at

20. Hatchitt's telemarketing operations, including for the 71988 campaigns, were conducted from and emanated from Florida, where Delfgauw resides, and where he directed and personally participated in the campaign at issue.

21. Hatchitt's actual and apparent principal place of business is in Florida, where Delfgauw operates, controls, and initiates its telemarketing operations.

22. Defendant Delfgauw is an individual natural person who resides in Cape Coral, Lee County, Florida.

23. Public corporate filings identify Delfgauw as Hatchitt's president, secretary, director, and principal officer. He is also the only listed Director.

24. Delfgauw personally directed and participated in Hatchitt's marketing and telemarketing operations, including lead acquisition, campaign configuration, vendor relationships, and compliance procedures.

25. Delfgauw personally participated in, authorized, or caused the telemarketing campaign alleged in this Amended Complaint.

26. Delfgauw holds himself out as telemarketing expert in SMS marketing and publicly promotes his text-message marketing activities.

---

https://www.wyomingnews.com/news/local_news/30-n-gould-st-businesses-blur-lines-of-what-it-means-to-be-a-sheridan/article_66d94fa4-ae8b-11ef-b606-7bad3d698a86.html (last visited July 30, 2026).

27. Using the online persona "Joey Matterhorn," Delfgauw maintains a website promoting his text-message marketing business and related tools.

28. Delfgauw's Joey Matterhorn website has a page dedicated to his text-message marketing.

29. Delfgauw's website specifically identifies short code 71988, where he personally states that "it is legitimate," and that he is "in the texting business":

**I JUST GOT A TEXT MESSAGE FROM SHORT CODE 71988**

by Joey Matterhorn | Sep 3, 2025 | Content Marketing | 0 comments



30. Delfgauw promotes his "toolbelt", including Text-Calibur as his platform used to send automated SMS messages and campaigns:




31. Hatchitt's website states: "our SMS short code [is] 71988."

32. These public statements and admissions demonstrate Delfgauw's promotion and use of the short code he created, and his platform used to send the messages received by Plaintiffs from that short code.

33. Delfgauw is personally and individually responsible for Hatchitt's telemarketing operations, strategies and performance, including placing the texts..

Delfgauw is personally liable for the violations of the TCPA, FTSA, and FTA because he had direct, personal participation in and/or personally authorized the conduct knowing that it violated the law. He was not merely tangentially involved. He directly, and knowingly and willfully, continued to text Plaintiffs despite their STOP requests.

34. Delfgauw exercised substantial control, if not sole control, over Hatchitt's telemarketing operations and practices, lead-generation activities, vendor relationships, and compliance policies, and personally participated in or authorized the campaign at issue.

35. Delfgauw's responsibilities included selecting or approving lead sources, message content, the sending platform, campaign timing, and procedures for recording and honoring opt-out requests.

36. Delfgauw is not a passive owner. He personally conducts telemarketing activities and directs the  business activities.

37. Hatchitt relies on outbound telemarketing text communications to secure leads and sell its services

38. Decisions regarding lead sourcing and marketing were made by Delfgauw.

39. Delfgauw personally participated in launching and overseeing the telemarketing campaigns and maintained final approval over the actions involved with the telemarketing operations.

40. Delfgauw made decisions concerning how leads would be generated, how and when texts would be transmitted, and the systems used to send them.

41. The telemarketing campaign was designed to generate leads and sales for Hatchitt.

42. Before and during the conduct alleged here, Hatchitt and Delfgauw had actual notice of complaints, claims, and litigation involving substantially similar, if not identical, violative telemarketing practices.

43. Despite that notice, Defendants continued to send the telemarketing messages after STOP requests and failed to ensure that effective suppression procedures were implemented.

44. Hatchitt, under Delfgauw's direction and control, and Delfgauw personally, did not implement or enforce adequate policies and procedures to ensure compliance with the TCPA and FTSA.

45. Hatchitt, under Delfgauw's direction and control, and Delfgauw personally, failed to maintain and enforce a lawful internal do-not-call policy.

46. Hatchitt, under Delfgauw's direction and control, and Delfgauw personally, failed to properly train personnel and agents regarding TCPA compliance requirements.

47. Hatchitt, under Delfgauw's direction and control, and Delfgauw personally, continued to place texts without obtaining prior express consent and continued to text individuals who had requested no longer be contacted.

48. The repeated post-STOP messages, prior notice, and continued campaign show that Defendants' conduct was knowing and willful.

49. These practices were the foreseeable and intended result of the telemarketing system designed, approved, implemented, and carried out by Delfgauw.

50. Delfgauw directly participated in, authorized, and ratified the conduct that gives rise to Plaintiffs' claims. He designed, approved and implemented the campaign that resulted in the texts to Plaintiffs and the putative Class Members.

51. Delfgauw's conduct was knowing and willful, or, at a minimum, constituted a gross failure to implement appropriate policies and procedures to ensure compliance with the TCPA and FTSA, particularly considering prior claims, complaints, and lawsuits regarding his telemarketing practices.

52. Because of his personal and active participation, Delfgauw is personally and individually liable for the acts and omissions alleged in this Amended Complaint.

53. When considering individual officer liability, a corporate officer involved in the telemarketing at issue may be personally liable, like here, when they have direct, personal participation in or personally authorize the conduct found to have violated the laws.

54. Delfgauw had direct, personal participation in, and personally authorized, approved, and/or ratified the acts or omissions complained of herein.

55. Specifically, Delfgauw: (a) participated in the selection and approval of the texts; (b) the methods and means by which the lists of phone numbers acquired were texted; (c) designed and approved the telemarketing campaigns; (d) drafted, worked on, and approved the scripting that would be used on the texts; and (e) selected, contracted for, created, used, and approved the CRM and dialing systems and equipment used to make the texts.

56. Indeed, Delfgauw was personally aware of Hatchitt's telemarketing practices, yet he continued to engage in and otherwise ratified the violative practices.

57. Delfgauw had actual knowledge of the violative practices but continued to participate in them and failed to stop them.

58. Despite prior notice of substantially similar complaints and claims, Delfgauw continued to participate in or authorize the challenged campaign, supporting an inference of knowing or willful conduct.

59. Delfgauw owed a duty to Plaintiffs. He breached that duty, by, among other things, disregarding their STOP requests and continuing to invade their privacy, intrude upon their seclusion, and harass them, among other harms that wasted their time, caused inconvenience, and disturbance. The challenged messages caused

Plaintiffs' wasted time, inconvenience, aggravation, and invasions of privacy, including after Plaintiffs submitted STOP requests.

60. Delfgauw was not merely acting as a passive corporate officer.

61. Defendants directly, individually, jointly, and/or in concert with another, or through other persons, entities or agents acting on their behalf, conspired to, agreed to, directly participated in, contributed to, authorized, assisted with, ratified, and/or otherwise caused all of the wrongful acts and omissions, including the dissemination of the unsolicited text messages that are the subject matter of this Amended Complaint.

62. Hatchitt is vicariously liable for the messages transmitted by any vendor or agent acting with actual or apparent authority, or whose conduct Hatchitt ratified by accepting, or intending to accept, the resulting leads and benefits, including all activity conducted by Delfgauw.

## FACTUAL ALLEGATIONS

## FTSA, FTA, AND TCPA BACKGROUND

### THE FTSA

63. It is a violation of the FTSA to "make or knowingly allow a telephonic sales call to be made if such call involves an automated system for the selection and dialing of telephone numbers or the playing of a recorded message when a connection

is completed to a number called without the prior express written consent of the called party." Fla. Stat. §501.059(8)(a).

64. The FTSA explicitly includes text messages in its prohibition of unsolicited marketing of "telephonic sales calls." Fla. Stat. § 501.059(1)(j).

65. Defendants at all times relevant hereto were "telephone solicitors" as defined by Fla. Stat. § 501.059(1)(i).

66. It is a violation of the FTSA to initiate an outbound telephone call, text message, or voicemail transmission to a consumer, business, or donor or potential donor who has previously communicated to the person that he or she does not wish to receive an outbound call, text message, or voicemail transmission. Fla. Stat. § 501.059(5)(a).

67. In violation of the FTSA, Defendants made and/or knowingly allowed outbound telemarketing text messages to Plaintiffs and the FTSA Class members, at least 15 days after they had previously communicated to Defendants that they did not wish to receive any text messages from Defendants. Fla. Stat. § 501.059(10)(c).

68. The FTSA's Caller ID Rules require that persons making Telephonic Sales Calls transmit – to the consumer's caller identification service – a telephone number that is capable of receiving telephone calls. And, unlike claims for damages for text message solicitations the called party does not consent to receive, claims for violations of the Caller ID Rules are equally applicable to all Telephonic Sales Calls

(phone calls, text messages, or voicemails), regardless of whether they are solicited or consented to, and irrespective of whether the offending phone call, text message or voicemail is traditional, automated, or recorded.

69. Whenever a person either makes any type of Telephonic Sales Call or causes one to be made, that person must ensure that a telephone number is transmitted with that Telephonic Sales Call to the consumer's Caller ID service that is capable of receiving telephone calls and connects to either the telephone solicitor or the Defendant. Whenever Telephonic Sales Call are made and the phone number that is transmitted to the caller identification service is not capable of receiving phone calls and/or does not connect to the caller or seller because it is not configured for two-way communication, the Caller ID Rules have been violated and the aggrieved party may bring an action for liquidated damages, and injunctive and declaratory relief.

**THE FTA**

70. Section 501.603 defines "commercial telephone solicitation" to include written communications or advertisements transmitted through any means. Section 501.616(6)(a) prohibits commercial telephone solicitation phone calls before 8:00 a.m. or after 8:00 p.m. in the called person's time zone. Plaintiff Parker received text-message solicitations before 8:00 a.m. in violation of these provisions.

**THE TCPA**

71. Title 47 C.F.R. § 64.1200(c)(1) provides that no person or entity shall initiate a telephone solicitation to a residential telephone subscriber before 8:00 a.m. or after 9:00 p.m. local time at the called party's location.

72. In 1991, Congress enacted the TCPA to regulate the explosive growth of the telemarketing industry. In so doing, Congress recognized that "[u]nrestricted telemarketing . . . can be an intrusive invasion of privacy[,]" and found that federal legislation was needed because "telemarketers [could] evade [state-law] prohibitions through interstate operations.'" *Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368, 372 (2012) (citations omitted).

73. The TCPA specifically required the FCC to "initiate a rulemaking proceeding concerning the need to protect residential telephone subscribers' privacy rights to avoid receiving telephone solicitations to which they object." 47 U.S.C. § 227(c)(1).

74. The FCC was instructed to "develop proposed regulations to implement the methods and procedures that the Commission determines are most effective and efficient to accomplish purposes of this section." Id. at (c)(1)(A), (E).

**Defendants' Telemarketing Campaign**

75. Hatchitt, by and through its officers, employees, and agents — and Delfgauw personally — placed, or had placed on its behalf, unsolicited telemarketing

text messages to solicit individuals to purchase or use its tax related products and services.

76. Hatchitt, by and through its officers, employees, and agents — and Delfgauw personally — purchased lists of individuals that were believed to be in need of tax planning services and/or tax advance loans and uploaded their information into Defendants' or their agents' CRM and dialing systems so that these individuals or "prospects" could be "cold called/texted" and solicited to purchase Defendants' services.

77. Defendants placed these telemarketing messages to individuals that did not sign up for Defendants services or otherwise provide consent to be contacted by Defendants, and to individuals who expressly requested to no longer be contacted by Defendants. Defendants did not scrub their lead lists to remove individuals, like Plaintiffs, who requested not to be contacted.

**The Telemarketing Campaign to Arrazola.**

78. Arrazola's personal telephone number ending in 1258 has received Defendants' Telephonic Sales Calls since at least August 2025. This number is used by Arrazola for residential purposes and is his residential number.

79. Screen shots of *some* of the telemarketing to Arrazola, including Arrazola's "STOP" requests, are depicted below for demonstrative purposes:







80. Defendants transmitted the telemarketing using short code 71988 to Arrazola's cellular number caller identification service. Calls to 71988 cannot be completed as dialed and the number is not capable of receiving phone calls.

81. Because Defendants continued to solicit Arrazola despite Arrazola's "STOP" request, it demonstrates both that an automated system was used to transmit the messages, and that short code 71988 was not capable of receiving Plaintiffs' incoming messages to remove Plaintiffs from Defendants' telemarking list.

82. The screenshots show Arrazola's STOP request. The subsequent solicitations show a failure to honor or implement the opt-out request.

83. To opt-out of any further telemarketing text communications with Defendants, Arrazola texted the word "stop" on August 25, 2025. Defendants ignored Arrazola's request and continued to text promotional telemarketing messages despite Arrazola's clear revocation of any alleged prior consent, including *at least* eleven (11) post-revocation text messages, on September 1, 2, 5, 9, 10, 13, 15, 19, 20, 26, and October 3, 2025.

84. Defendants, through counsel, have produced business records confirming the dates of the above texts.

**The Telemarketing Campaign to Parker.**

85. Beginning at least in September 2024, Parker's personal cellular telephone number ending in 7971 received telemarketing text messages from Defendants through short code 71988. Parker uses the number for personal and residential purposes.

86. On or about September 18, 2024, Parker texted STOP to opt-out of any further text message communications with Defendants.

87. Screen shots of *some* of the telemarketing to Parker, including Parker's "STOP" requests, are depicted below for demonstrative purposes:












88. Defendants transmitted the telemarketing using short code 71988 to Parker's cellular number caller identification service. Calls to 71988 cannot be completed as dialed and the number is not capable of receiving phone calls.

89. Because Defendants continued to solicit Parker despite Parker's numerous "STOP" requests, it demonstrates both that an automated system was used

to transmit the messages, and that short code 71988 was not capable of receiving Plaintiffs' incoming messages to remove Plaintiffs from Defendants' telemarking list.

90. The screenshots show Parker's STOP requests. The subsequent solicitations reflect a failure to honor or implement the opt-out requests.

91. To opt-out of any further telemarketing text communications with Defendants, Parker texted the word "stop" at least seven times. Defendants ignored Parker's request and continued to text promotional telemarketing messages despite Parker's clear revocation of any alleged prior consent, including *at least* sixty-three (63) post-revocation text messages, including as recently as January 6, 2026.

92. Several of these texts were sent in the early morning hours, including on weekend mornings at or around 7:00 a.m. Some of these texts are depicted below for demonstrative purposes:







93. Because Parker has not filed a tax return since she was a Florida resident (due to disability), and the texts sent to her were attempting to solicit tax refund loans in connection with her tax return, it demonstrates that Defendants intended to, and believed, that Parker resided in Florida and that they were targeting a Florida consumer.

94. Defendants, and Delfgauw individually, obtained Parker's information through public records or other lead sources. Defendants, and Delfgauw individually, used these sources to target Florida consumers, or consumers they believed to reside in Florida. Some of the texts sent to Parker state, "*I found public & tax records . . .*" and she had "*unclaimed money*." Public records regarding Plaintiff's tax filings associate and connect her as a Florida resident.

95. Defendants' intent to target Florida consumers is further demonstrated given that Arrazola and Parker received substantially similar texts offering tax advance loans. Hatchitt was also previously sued in the matter of *Gaikowski v. Hatchitt Tax Club, Inc.* That Florida consumer also received the same tax refund alternative program texts that Plaintiffs received after sending multiple STOP requests. 2:24-cv-14282 (S.D. Fla. 2024).

96. Plaintiff's counsel's investigation has revealed that Delfgauw continues to send text message telemarketing to other Florida residents after they request that he STOP, including during this litigation.

97. During the pendency of this litigation, Parker also received three identical prerecorded personal-loan calls during late June and early July 2026 from a separate business operated by Delfgauw named Cloud Based Personal Loans, Inc.

98. Cloud Based Personal Loans, Inc.'s sole Director, President, and Secretary is Joseph Delfgauw, where it and he share the same corporate [non]address as Hatchitt

99. Parker does not seek relief for those calls in this action, but they are relevant here because they show Delfgauw's common link between the two companies and the telemarketing calls, his personal involvement in the telemarketing, and the use of a common lead source or marketing list used by Delfgauw.

**Defendants' dialing system.**

100. The selection and dialing of numbers for the texts at issue are done using an automated system because the texts were sent from a short code used to message consumers en masse; because Defendants' dialing equipment includes features substantially similar to a predictive dialer, inasmuch as it is capable of making calls/texts without manually dialing the recipients numbers; and because the combination hardware and software system(s) used by Defendants to send such texts have the capacity to both select numbers to be dialed and to dial such numbers in an automated fashion based on predetermined, programmed, or random criteria or settings.

101. Defendants' automated system selects and dials numbers from a lead list of numbers to be dialed without regard to whether those numbers have requested to no longer be contacted. If it was not automated, human intervention would have

prevented the texts from being placed to a number that should have been "flagged" as do-not-call and removed from Defendants' telemarketing list.

102. Delfgauw states on his website that his texting platform sends "automated SMS messages and campaigns."

103. The FTSA's Caller ID Rules require any person "who makes a telephonic sales call or causes a telephonic sales call to be made to … transmit … the originating telephone number," or, as a substitution, "the name of the seller on behalf of which a telephonic sales call is placed and the seller's customer service telephone number, which is answered during regular business hours" ("Customer Service Number"), to the receipt's caller identification service.

104. Here, with each of Defendants' telemarketing text messages, Defendants transmitted a telephone number to the Caller ID Service of Plaintiffs and the Plaintiff Class that was not capable of receiving telephone calls, failed to connect the recipients, including Plaintiffs, to the Defendants, and failed to provide Defendants' customer service telephone number, as explicitly required by the FTSA's Caller ID Rules.

105. Further, prior to making (or knowingly allowing a third party to make on its behalf) the subject telemarketing text messages Defendants lacked a signed written agreement with Plaintiffs that complies with the requirements of the TCPA and Fla. Stat. § 501.059(1)(g).

106. Defendants' failure to honor opt-out instructions by Plaintiffs and the Class members is indicative of Defendants' failure to 1) maintain and implement adequate written policies and procedures regarding its text messaging marketing; (2) provide training to its personnel engaged in telemarketing; and (3) maintain a standalone do-not-call list.

107. To the extent Defendants outsourced the telemarketing campaign, Defendants are nonetheless liable for texts that violate the TCPA and/or FTSA.

108. Defendants are liable for third-party actions if they took steps to cause the telemarketing texts to be made, or if the telemarketing texts were made pursuant to Defendants' actual authority, apparent authority and/or ratification, or pursuant to joint enterprise or acting in concert liability.

109. Defendants had the ability and/or right to control the method and scope of the telemarketing text message campaigns sent to Plaintiffs and the Class members.

110. Defendants had the ability and/or right to control the timing and approve, write, and review the content of the telemarketing text message campaigns sent to Plaintiffs and the Class members.

111. Defendants authorized the use of their trade name in the telemarketing text messages sent to Plaintiffs and Class Members.

112. Defendants knowingly accepted the marketing benefits of the telemarketing text messages sent to Plaintiffs and the Class members, including the consumer leads generated through transmissions of the messages.

113. Given Defendants' control over the telemarketing text messaging campaigns at issue and/or its ratification of the campaigns, Defendants are vicariously liable for the violations alleged herein.

114. Defendants failed to keep, maintain, implement, and/or enforce policies and procedures to ensure compliance with the FTSA and TCPA, and/or provide adequate oversight to ensure compliance with any policies it maintained.

115. Compliance with the FTSA will not result in Defendants having to cease its business operations.

116. The challenged FTSA conduct occurred in Florida because the 71988 campaign was initiated or conducted from Florida.

117. Applying the FTSA to that conduct would not regulate commerce occurring wholly outside Florida.

118. Defendants can comply with the FTSA without ceasing lawful business operations.

119. Because Defendants' FTSA violations occurred in Florida, requiring Defendants' compliance with the FTSA will not have the practical effect of regulating commerce occurring wholly outside of Florida.

120. The requested relief would require compliance only with Florida law applicable to the Florida-originated campaign alleged here.

121. Plaintiffs were the subscribers or customary users of their respective cellular telephone numbers that Defendants texted and are financially responsible for their phone service, including the cellular costs and data usage incurred as a result of the calls made to Plaintiffs by Defendants.

122. The telemarketing text messages at issue caused Plaintiffs and putative Class Members harm. In addition to using their cellular data, storage, and battery life, they suffered invasion of privacy, aggravation, annoyance, frustration, distraction, and their seclusion was intruded upon, forcing them to divert attention away from their work, home life and other activities, inconvenience, wasted time, risk of future harm, causing disruption to their work, sleep, and other activities, and violations of their substantive statutory rights under the TCPA and FTSA to remain free of unsolicited calls. The texts are a disruptive nuisance. The receipt of the text messages distracted Plaintiffs and took time away from their personal and work activities. *See Drazen v. GoDaddy.com, LLC,* No. 21-10199 (11th Cir. July 24, 2023) (en banc) ("A plaintiff who receives an unwanted, illegal text message suffers a concrete injury"));*See, e.g., Mims v. Arrow Fin. Servs., Inc.*, 132 S. Ct. 740 (Jan. 18, 2012) (discussing congressional findings of consumer "outrage" as to autodialed and prerecorded calls).

123. Plaintiffs and Class Members had to spend wasted time away from work, family, and personal activities, and suffered aggravation, because of Defendants' unsolicited telemarketing text messages.

124. For example, apart from forcing Plaintiffs to spend time investigating the source of the text messages and investing time researching and hiring counsel, Plaintiffs received some of the unsolicited telemarketing text messages while they were sharing personal and intimate time with family. This caused Plaintiffs to stop to check their phones and waste time reviewing the messages to confirm they were not for an emergency purpose, causing specific injury, trespass, intrusion and disruption onto Plaintiffs' personal and daily life.

125. Because Plaintiffs and Class Members continued to receive telemarketing texts from Defendants after submitting STOP requests, judicial intervention and injunctive relief are necessary to prevent continued and future harm.

126. Furthermore, because Defendants have previously been the subject of litigation involving the identical claims and violations alleged here, including Defendants' use of the short code 71988 to send text message solicitations after receiving STOP requests, it demonstrates willfulness and the need for an enforceable judicial injunction.

127. Moreover, undersigned counsel provided pre-suit notice to Defendants' counsel regarding the on-going violations to Arrazola. Despite this actual notice of the

continued violations and Defendants failed opt-out system, Defendants continued with their telemarketing campaign, as evidenced at least by the January 6, 2026, text message to Parker.

128. Because Defendants continue to violate the law and have not reformed their telemarketing practices despite previously being sued for the same conduct, an enforceable injunctive order is necessary to stop Defendants' continued violations.

## CLASS ACTION ALLEGATIONS

129. Plaintiffs bring this class action under Rule 23(a),(b)(2), and(b)(3) of the Federal Rules of Civil Procedure, on behalf of themselves, respectively, and of similarly situated "Classes" or "Class Members" defined as:[2]

> **<u>FTSA Internal DNC Class:</u> All persons who, within the four years prior to the filing of the original Complaint through the date of Class Notice, received any text message from or on behalf of Defendants through short code 71988 at least 15 days after communicating to Defendant that they did not wish to receive text messages by replying to the messages with "stop" or similar opt-out instruction.**
>
> **<u>FTSA ID Class:</u> All persons who, within the four years prior to the filing of the original Complaint through the date of Class Notice, received a text message from or on behalf of Defendants through short code 71988, whose caller identification service displayed short code 71988, and was not accompanied by a qualifying substitute customer-service**

2. Plaintiffs allege their respective causes of action individually, and on behalf of similarly situated classes, as reflected in the counts below in this First Amended Complaint.

**number, was not capable of receiving voice telephone calls, and did not connect the recipient to Defendants.**

**Florida Telemarketing Act After Hours Class: All persons who, during the four years preceding the filing of the original Complaint through the date of class notice, received from or on behalf of Defendants, a commercial telephone solicitation in the form of a text message before 8:00 a.m. or after 8:00 p.m. local time in the recipient's time zone.**

**TCPA After Hours Class: All persons who, during the four years preceding the filing of the original Complaint through the date of class notice, received, within any 12-month period, more than one telephone solicitation in the form of a text message from or on behalf of Defendants before 8:00 a.m. or after 9:00 p.m. local time at the recipient's location.**

130. Excluded from the Classes are: any Defendant, and any subsidiary or affiliate of that Defendant, and the directors, officers and employees of that Defendant or its subsidiaries or affiliates, and members of the federal judiciary.

131. This action has been brought and may properly be maintained as a class action against Defendants because there is a well-defined community of interest in the litigation and the proposed Classes are easily ascertainable. Plaintiffs reserve the right to amend, expand, or narrow the Class definitions if discovery and further investigation reveal that any Class should be expanded or otherwise modified.

132. Numerosity: Given the nature of the claims and that Defendants' conduct consisted of a standardized spam text messaging campaign electronically sent to particular telephone numbers, Plaintiffs believe, at a minimum, there are greater

than one (100) Class Members. Plaintiffs believe that the Classes are so numerous that joinder of all members of the Classes is impracticable and the disposition of their claims in a class action rather than incremental individual actions will benefit the Parties and the Court by eliminating the possibility of inconsistent or varying adjudications of individual actions.

133. The precise Class sizes and the identities of the individual members are ascertainable through Defendants' records, including Defendants' texting logs and marketing records.

134. Members of the Classes may additionally or alternatively be notified of the pendency of this action by techniques and forms commonly used in class actions, such as by published notice, e-mail notice, website notice, fax notice, first class mail, or combinations thereof, or by other methods suitable to this class and deemed necessary and/or appropriate by the Court.

135. **Existence and Predominance of Common Questions of Fact and Law**: There is a well-defined community of common questions of fact and law affecting the Plaintiffs and members of the Classes. Common questions of law and/or fact exist as to all members of the Classes and predominate over the questions affecting individual Class members. These common legal and/or factual questions include, but are not limited to, the following:

a. Whether Defendants initiated, caused, authorized, or ratified the 71988 campaign from Florida;

b. Whether the challenged messages were telephonic sales calls, commercial telephone solicitations, or telephone solicitations under the statutes and regulation alleged;

c. How Defendants obtained the telephone numbers included in the campaign;

d. Whether 71988 received and recorded Plaintiffs' and Class Members' STOP requests;

e. Whether Defendants sent additional text-message solicitations through 71988 more than 15 days after STOP requests without renewed consent;

f. Whether 71988 could receive voice calls or connect recipients to Defendants and whether the messages provided a qualifying customer-service number;

g. Whether the early-morning text-message solicitations violated Fla. Stat. § 501.616(6)(a);

h. Whether the early-morning text-message solicitations violated 47 C.F.R. § 64.1200(c)(1);

i. Whether Delfgauw personally participated in, authorized, or caused the challenged conduct;

j. Whether Defendants acted knowingly or willfully;

k. Whether Plaintiffs and Class Members are entitled to statutory, actual, enhanced, or punitive damages and attorney's fees and costs where authorized;

l. Whether declaratory or injunctive relief is appropriate; and

m. Whether Plaintiffs and the Classes are entitled to other relief.

136. One or more questions or issues of law and/or fact regarding Defendants' liability are common to all Class Members and predominate over any individual issues that may exist and may serve as a basis for class certification under Rule 23(c)(4).

137. **Typicality:** Plaintiffs' claims are typical of the claims of the Classes they respectively seek to represent. Their claims arise from the same standardized 71988 campaign and legal theories as the claims of the proposed Classes.

138. Plaintiffs' claims are typical of the Classes they respectively seek to represent. Both Plaintiffs received solicitations through 71988, submitted STOP requests, and received additional solicitations. Both also received messages displaying 71988 without a callable customer-service number, was not capable of receiving voice telephone calls, and/or did not connect the recipient to Defendants. Parker additionally received more than one early-morning solicitation within a 12-month period and is the proposed representative of the FTA and TCPA After Hours Classes.

139. **Adequacy of Representation:** Plaintiffs are adequate representatives because their interests do not conflict with those of the proposed Classes. Plaintiffs will fairly, adequately, and vigorously represent and protect the Classes and have no interests antagonistic to Class Members. Plaintiffs have retained counsel experienced in TCPA, FTSA, FTA, and class-action litigation.

140. **Superiority**: A class action is superior to other available means for the fair and efficient adjudication of the claims of the Classes. While the aggregate damages which may be awarded to the members of the Classes are likely to be substantial, the damages suffered by individual members of the Classes are relatively small. As a result, the expense and burden of individual litigation makes it economically infeasible and procedurally impracticable for each member of the Class to individually seek redress for the wrongs done to them. Plaintiff does not know of any other litigation concerning this controversy already commenced against Defendants by any member of the Classes. The likelihood of the individual members of the Classes prosecuting separate claims is remote. Individualized litigation would also present the potential for varying, inconsistent or contradictory judgments, and would increase the delay and expense to all parties and the court system resulting from multiple trials of the same factual issues. In contrast, the conduct of this matter as a class action presents fewer management difficulties, conserves the resources of the parties and the court system, and would protect the rights of each member of the

Classes. Plaintiff knows of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action.

141. **Class-Wide Injunctive Relief:** In addition to certification under Rule 23(b)(3), certification under Rule 23(b)(2) is appropriate because Defendants acted or refused to act on grounds generally applicable to the proposed Classes. Plaintiffs seek classwide declaratory and injunctive relief requiring Defendants to honor opt-out requests and comply with the caller-identification and quiet-hours requirements alleged herein.

## CAUSES OF ACTION
## COUNT I
## VIOLATIONS OF FLORIDA STATUTE § 501.059(5)
## (On behalf of Plaintiffs and the FTSA Internal DNC Class)

142. Plaintiffs incorporate all preceding allegations contained in paragraphs 1 through 141 as if fully set forth herein.

143. It is a violation of the FTSA to initiate an outbound telephone call, text message, or voicemail transmission to a consumer, business, or donor or potential donor who has previously communicated to the person that he or she does not wish to receive an outbound call, text message, or voicemail transmission. Fla. Stat. § 501.059(5)(a), (b).

144. Plaintiffs and the FTSA Internal DNC Class Members made requests to Defendants not to receive spam telemarketing text messages from Defendant.

145. Defendants failed to honor Plaintiffs' and the FTSA Class Members opt-out requests.

146. In violation of the FTSA, Defendants made and/or knowingly allowed outbound telemarketing text messages to Plaintiffs and the FTSA Class members, at least 15 days after they had previously communicated to Defendants that they did not wish to receive any text messages from Defendants.

147. Arrazola texted Defendants STOP on August 25, 2025. Plaintiff received *at least* eight (8) text messages from Defendants 15 or more days after texting STOP.

148. Parker texted Defendants STOP on September 18, 2024. Plaintiff received *at least* fifty (50) text messages from Defendants 15 or more days after texting STOP.

149. Every post-revocation text sent to Plaintiffs promoted, offered, or attempted to sell Defendants' products or services. All of the texts were substantially similar to the representative text messages reproduced in this First Amended Complaint.

150. As a result of Defendants' conduct, pursuant to Fla. Stat. § 501.059(10)(a), Plaintiffs and the FTSA Internal DNC Class are entitled to recover actual damages or $500 per violation, whichever is greater. If the Court finds that Defendants' violations were knowing or willful, it may increase the award up to three times pursuant to Fla. Stat. § 501.059(10)(b).

WHEREFORE, Plaintiffs respectfully request the Court grant Plaintiffs and the Class members relief against Defendants, individually, jointly, and collectively, as set forth in the Prayer for Relief below

**COUNT II**
**VIOLATIONS OF FLORIDA STATUTE § 501.059(8)**
**(On behalf of Plaintiffs and the FTSA ID Class)**

151. Plaintiffs incorporate all preceding allegations contained in paragraphs 1 through 141 as if fully set forth herein.

152. Defendants violated Fla. Stat. § 501.059(8)(b) by transmitting short code 71988 to Plaintiffs' and Class Members' caller-identification services even though 71988 was not capable of receiving voice telephone calls and did not connect callers to Defendants.

153. The challenged solicitations also did not transmit or substitute the seller's name and a customer-service telephone number answered during regular business hours.

154. Plaintiffs suffered actual harm because of this violation. Because Defendants' Short Code did not receive Plaintiffs' STOP messages and because the Short Code was not capable of receiving calls, Defendants continued to text them causing invasion of privacy, nuisance, wasted time, aggravation, and the other harms alleged in this First Amended Complaint.

155. The alleged violations deprived Plaintiffs and Class Members of the statutorily required means to identify and reach the solicitor or seller. Plaintiffs spent additional time attempting to call 71988, investigating the sender, and locating a callable number through which to contact Defendants.

156. Plaintiffs and the members of the Plaintiff Class are entitled to a declaration that Defendants' actions, as set out above, violate the FTSA's Caller ID Rules.

157. Under Fla. Stat. § 501.059(10), Plaintiffs and members of the FTSA ID Class are entitled to recover actual damages or $500 per violation, whichever is greater, together with any available enhancement for knowing or willful violations.

WHEREFORE, Plaintiffs respectfully request the Court grant Plaintiffs and the Class members relief against Defendants, individually, jointly, and collectively, as set forth in the Prayer for Relief below.

**COUNT III**
**VIOLATIONS OF FLORIDA STATUTE § 501.616(6)(a)**
**(On behalf of Plaintiff Parker and the FTA After Hours Class)**

158. Parker incorporates all preceding allegations contained in paragraphs 1 through 141 as if fully set forth herein.

159. Pursuant to the Florida Telemarketing Act, Florida Statute 501.616(6)(a):

> A commercial telephone seller or salesperson may not make any of the following types of phone calls, including calls made through automated dialing or recorded messages:
>
> (a) A commercial telephone solicitation phone call before 8 a.m. or after 8 p.m. local time in the called person's time zone.

160. Defendants violated these provisions by sending Parker commercial telephone solicitations in the form of text messages at the following times:

a. January 4, 2026, at 7:10 a.m.;

b. July 1, 2025, at 7:04 a.m.;

c. April 29, 2025, at 7:18 a.m.; and

d. May 3, 2025, at 7:03 a.m.

161. The texts to Parker were commercial telephone solicitations because they were unsolicited written communications, notifications or advertisements, and/or were transmitted using an automated system. Fla. Stat. § 501.603(1).The messages represented the availability of consumer services and invited Parker to respond through her telephone by submitting an acceptance code or accessing the provided application link. These written communications constitute commercial telephone solicitations within the meaning of Fla. Stat. § 501.603(1) because they were unsolicited written communications, notifications or advertisements, and/or were transmitted using an automated system.

162. The texts were for the purpose of selling consumer goods or services related to tax loans.

163. Defendants were commercial telephone sellers or salespersons because they engaged in, managed, or caused the commercial telephone solicitations alleged here. Fla. Stat. § 501.603.

164. Under Fla. Stat. § 501.625, Parker and members of the FTA After Hours Class are entitled to recover actual damages and, where warranted, punitive damages, together with costs, court costs, and attorney's fees.

165. Plaintiff Parker seeks injunctive relief prohibiting Defendants' unlawful conduct in the future to protect Plaintiff Parker and the Class members from Defendants' unsolicited calls and practices.

166. Defendants' ongoing and continuing violations have caused, and in the absence of an injunction will continue to cause, harm to Plaintiff Parker and the Class members.

167. Plaintiff Parker and the Class members will suffer irreparable harm if Defendants are permitted to continue its practice.

168. The public interest will be served by an injunction prohibiting Defendants from continuing to engage in the unlawful practices described herein.

169. Plaintiff Parker is also entitled to reasonable attorney fees and costs incurred in prosecuting this action. Fla. Stat. § 501.625

WHEREFORE, Plaintiff Parker respectfully requests that the Court grant Parker and the Class Members relief against Defendants, individually, jointly, and collectively, as set forth in the Prayer for Relief below.

## COUNT IV
## VIOLATIONS OF THE TCPA
## (On behalf of Plaintiff Parker and the TCPA After Hours Class)

170. Parker incorporates all preceding allegations contained in paragraphs 1 through 141 as if fully set forth herein.

171. Title 47 C.F.R. § 64.1200(c)(1) provides that: "No person or entity shall initiate any telephone solicitation to: (1) Any residential telephone subscriber before the hour of 8 AM or after 9 PM. (local time at the called party's location)."

172. Defendants violated this regulation by sending Parker telephone solicitations in the form of text messages at the following times:

a. January 4, 2026, at 7:10 a.m.;

b. July 1, 2025, at 7:04 a.m.;

c. April 29, 2025, at 7:18 a.m.; and

d. May 3, 2025, at 7:03 a.m.

173. Parker received more than one such telephone solicitation within a 12-month period, including the messages identified above. Each member of the TCPA

After Hours Class likewise received more than one such solicitation within a 12-month period.

174. As a result of Defendants' violations, Parker and members of the TCPA After Hours Class suffered the injuries alleged above and are entitled under 47 U.S.C. § 227(c)(5) to recover actual damages or up to $500 per violation, as permitted by law.

175. To the extent Defendants' violations were knowing or willful, the Court may increase the award up to three times under 47 U.S.C. § 227(c)(5).

WHEREFORE, Plaintiff Parker respectfully requests that the Court grant Parker and the Class Members relief against Defendants, individually, jointly, and collectively, as set forth in the Prayer for Relief below.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the proposed Classes, request the following relief:

a. An order certifying this case as a class action, certifying Plaintiffs as representatives of the Classes, and designating Plaintiffs' attorneys Class counsel;

b. An order declaring that Defendants' conduct violated the FTSA, FTA, TCPA, and applicable regulations as alleged;

c. Actual or statutory damages under the FTSA and TCPA, and actual and

punitive damages under the FTA, in amounts proven or authorized by law;

d. Enhanced damages up to three times the applicable statutory award for knowing or willful violations where authorized;

e. Appropriate injunctive relief requiring Defendants to honor opt-out requests and comply with the caller-identification and quiet-hours requirements alleged in this Complaint;

f. Reasonable attorney's fees and costs; and

g. Such further and other relief as this Court deems reasonable and just.

**DEMAND FOR JURY TRIAL**

Plaintiffs individually and on behalf of the Classes, hereby demand a trial by jury.

Dated: August 5, 2026 Respectfully submitted,

*/s/ Joshua Eggnatz*
Joshua H. Eggnatz, Esq.
Florida Bar No.: 0067926
**EGGNATZ | PASCUCCI**
7450 Griffin Road, Suite 230
Davie, Florida 33314
Tel: (954) 889-3359
jeggnatz@justiceearned.com

*/s/ Alexander Korolinsky*

Alexander J. Korolinsky, Esq.
Florida Bar No.: 119327
**AJK LEGAL**
1580 Sawgrass Corp Pkwy, Suite 130
Sunrise, Florida 33323
Tel: (888) 815-3350
korolinsky@ajklegal.com

*Counsel for Plaintiffs and the proposed Classes*

## CERTIFICATE OF SERVICE

I hereby certify that on August 5, 2026, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to all parties of record.

Garrett L. Roberts
Florida Bar No. 1038482
**WADE | ROBERTS**
1420 Celebration Blvd., Suite 200
Celebration, Florida 34747
(813) 344-2655
*garrettroberts@waderobertslaw.com*

*Attorneys For Defendants Hatchitt Tax Club, Inc. and Joseph Delfgauw*